a long-term relationship between two law firms. The appellees, Morgan Verkamp and its principals cut my client out from representing one of the clients underneath that relationship, a man named Mr. App. My client brought fraud, unjust enrichment, breach of contract, and tortious interference with a prospective contract against Morgan Verkamp. The question for this court is whether a Texas district court has jurisdiction over those claims. Now, this is not a question that turns on Morgan Verkamp's physical presence in Texas like is commonly at issue in a jurisdiction case. Instead, this involves a situation where two service-focused entities agreed to work together where each of them did much of their work from their respective home states. For legal standards well established, Morgan Verkamp's suit-related conduct has to have a substantial connection to the forum. I believe it does for all of the claims at issue here. Morgan Verkamp and Danziger agreed to work together on Mr. App's case and share any fees that resulted from that representation, a third to Danziger, a third to Morgan Verkamp, and a third based on the amount of hours that each of the parties had worked. But after knowingly affiliating itself with Danziger, a Texas-based entity, causing Danziger to undertake some economic activity in Texas, Morgan Verkamp took advantage of Mr. App's hesitancy to file to cut Danziger out. That meant Morgan Verkamp did not pay Danziger the one-third of the fee. That meant that Danziger did not have the opportunity to work with Mr. App all on its own and that Danziger did not have the opportunity to work with Morgan Verkamp to earn a share of that remainder of the fees. Do you disagree with any of the legal analysis, the personal jurisdiction analysis done by Judge Bibas in the Third Circuit in terms of the elements? He only touched on this issue in Texas as to the 1661 transfer question. But as to his legal analysis, would you agree with their approach? I don't disagree with his approach, Your Honor. I think some of it turned on a question of Third Circuit in Pennsylvania. Right. But it does seem, the analysis does seem to limit purposeful availment as to the activities alleged in the claims. So we're looking, you agree with that? And so this relates to App, German citizen living in Dubai. No, I don't, I don't agree with that, Your Honor. Okay. I think this relates to the agreement between Danziger and Morgan Verkamp. As to App? As to App, yes, Your Honor. And that's an alleged oral contract? Yes, Your Honor, it is. And no email or anything concerning this? No, Your Honor, there wasn't because this was the third agreement that the parties had had regarding clients. It was the same term. They had already filed two cases together at that point. Danziger had introduced other additional potential clients to Morgan Verkamp. And so— I thought there was one email, the Heavens Know email, reply. Yes, so I'm sorry, Judge Names. I believe your question, I thought your question was directed whether there's an email relating to the formation of this contract or not. There were several emails relating to Mr. App Exchange between the parties that came later on in 2010. That that was sort of the genesis of the fraud claim, which I've— Which they initiated or your client? No. No, Your Honor. Danziger initiated both introducing these clients to Morgan Verkamp and emailing about that subsequent case and whether that related to Mr. App or not. And we, as to the, okay. And the breach clearly didn't happen, as to the alleged contract, didn't happen in Texas. And the nonpayment of the mounts, the referral fee, you claim? I think it's almost a metaphysical question, Your Honor, of where that nonpayment occurred because Danziger had done its work in Texas. Danziger was entitled to a fee in Texas, and Morgan Verkamp refused to pay that to Texas. Now, they refused to pay it from their office in Ohio, but the underlying contract was that both parties would work together to, to resolve Mr. App's case. And so the breach of that contract was not necessarily, the damages were the failure to pay, but the breach was the failure to include Danziger in that representation. The Arsene Ha case, why is that distinguishable? Isn't that sort of similar? There were emails coming in, but it's just the fortuity of the location of your client. It wasn't that the defendant was doing activities in Texas. Yes, Your Honor, so I believe the Senghaw case is specifically directed to the tortious interference with, with contract claim. And Your fraudulent nondisclosure aspect, you, you're claiming they fraudulently didn't disclose that they were doing this ketam work. Yes, Your Honor, that, that's one of our claims. Another claim is that they tortiously interfered with our ability to contract Mr. App, and I think that's where the Senghaw case has some applicability, even though I think it's not distinguishable. So, to your question, the tortious interference with prospective contract was in 2010, when separate and apart from our communications with Morgan Verkamp, Morgan Verkamp emailed Mr. App and said, don't worry about Danziger, if you tell me to, I will reach out, but otherwise I will reasonably compensate them. That email was designed to prevent Mr. App and Danziger from ever connecting back up. So the prospective contract would have been between Danziger and Mr. App, and the purpose of that email wasn't simply fortuitous to prevent Mr. App from reaching out to any other law firm. It was to prevent Mr. App from connecting with Danziger. It was harm that was directed specifically, deliberately, and intentionally at one entity, a Texas-based law firm. I think the difference from Senghaw is in Senghaw, the place of performance, the focus was, the record seems a little unclear, but was essentially the Gulf of Mexico, and was more targeted at one particular pilot, not working on certain ships, rather than harming a Texas resident who would have done work in Texas. So the fraud claim, Your Honor, is a little different. The fraud claim relates to the fact that they had an agreement, that Morgan Verkamp introduced Mr. App to these, excuse me, that Danziger introduced Morgan Verkamp to Mr. App, that they agreed to work together. This was the third time that they had agreed to work together. They worked to try to get Mr. App to file. He chose not to at that time. He went silent for a couple of years, and Your Honor, you're correct when you noted that the 2010 email when we asked, does this news story relate to Mr. App, and they replied, no it doesn't. That was correct. That was a correct response. But one of three things must have been true at that time. Either Morgan Verkamp was talking with Mr. App, and they just neglected to mention it. The fact that Danziger reached out to Morgan Verkamp reminded them, caused them to reach out to Mr. App, or fortuitously, both Danziger and Mr. App reached out to Morgan Verkamp within days of each other. But within two months of that email, Mr. App's case was on file. Now the parties continued to work together on other cases for years after this, and not once did Morgan Verkamp say anything about Mr. App to Danziger. That's the basis for the fraudulent non-disclosure. I think, starting with Lion Air and a number of cases since then, the circuit has established that intentional torts, fraudulent misstatements, and fraudulent omissions directed to a forum serve as the basis of jurisdiction. Now, I think Morgan Verkamp has a little bit of difficulty applying the principle, disputing the application of those principles to this case. So instead, I think they leave the court down a couple paths that just aren't correct. So for starters, they refer to a couple Supreme Court opinions, one from the United States Supreme Court. But before we leave Lion Air, they're the defendant, the non-resident defendant did initiate letters and calls and faxes, correct? Well, I guess, Your Honor, from the get-go, no, the client came from Danziger, you're correct. But once that introduction had been made, then Morgan Verkamp did initiate calls, did participate in conference calls. As to App? As to App, Your Honor. So I agree, after the initial introduction, had that been the entirety of the communications, I think there would be a difficult case to make for jurisdiction. But once it turns into a back-and-forth, with Morgan Verkamp working with Danziger, asking Danziger to do work in Texas, and the three parties, excuse me, the two parties and Mr. App all talking together on it, I think at that point, Morgan Verkamp is taking advantage of a Texas entity. It is purposefully availing itself. And if something happens with that relationship, it should anticipate being hailed into Texas court. And to the United States Supreme Court's Walden opinion, I just don't think it's applicable here. The Supreme Court expressly reserved any discussion of remote or virtual contacts, and that's essentially the entirety of this case, is emails and phone calls, and a lawsuit that was filed in the third location. I also don't think that this court needs to worry about the Texas Supreme Court's opinion in Mishiana. For starters, Mishiana was a stream of commerce case that seemed to be the body of law the Texas Supreme Court relied on, and it's not Fifth Circuit law anyways. So I think when you take the principles of wide air and the torts that are applied, that is sufficient in this case for there to be jurisdiction over the fraud claim. Now on the breach of contract claim, I think we need to focus on the three elements that the Supreme Court directs us to from Burger King, the prior negotiations, the agreement itself, and the contemplated future consequences. We've talked about the prior negotiations, and they were certainly done from Morgan Verkamp in Ohio and Danziger in Texas. As the court noted in Central Freight, though, that at least makes them half based in Texas and half based in Ohio, and Morgan Verkamp was choosing to affiliate itself with a Texas-based entity. Now the oral agreement, there's very little in the record about that, I agree, but there are two things I'd like to note from it. One is that it shows the course of dealing between the parties. This was the third time that Morgan Verkamp had associated itself with Danziger. Morgan Verkamp wanted to work cases with Danziger. In fact, it hired him as local counsel in Texas in another case. It knew Danziger was going to do legal work from Texas. The other thing is that this oral agreement has no choice of law provision. I think many of the cases that Morgan Verkamp relies on, that's an important consideration for the court, because it shows the parties' intentions and what they anticipated. And similarly, the lack of one suggests that Morgan Verkamp did anticipate that it could be called into Texas if it didn't comply with the terms of this agreement. Lastly on the contemplated future consequences, and this is where I think that remaining third that the parties had left based on work done is important, because that shows that the parties contemplated that each would do work, that Danziger would do work from Texas. There's no reason to include a clause like that unless you anticipate that your counterparty is going to do work. And I think Morgan Verkamp points out several times that Danziger didn't do much work, but Danziger didn't do much work because Morgan Verkamp cut it out from the representation. Where in the amended complaint is there a description of any work that Danziger did on the Ketam case? Yes, Your Honor. So, I don't, I apologize, I don't have the exact record sites in front of me, but the May 2000, May 2007 was when the oral agreement was formed. After that time, both parties worked together to try to file Mr. Epps' case. They dealt with answering his questions about the fee agreement, and I agree Danziger was copied on some of those emails, but certainly Danziger and Morgan Verkamp were working together once they had that agreement to get Mr. Epps' case on file. And I think had this case continued all the way through, you would have seen hours billed by Danziger for the work that it did in 2007 after the agreement was struck that would have gone to the dividing up of that final third. So the answer is you did state in the complaint that there was work done by Danziger on the referral arrangement was set up for any and all Ketam plaintiffs? Yes, Your Honor. The complaint lists the discussions, the phone calls, the efforts to try to get Mr. Epps to file that Danziger was a part of. Was it evidence of the course of practice in the other cases, how much, or how much work you did, your firm did? Your Honor, I don't believe there is record evidence that relates to how much work Danziger did. I can certainly represent to the court that Morgan Verkamp did more, but I don't think there's record evidence of exactly how much. The last thing I'd like to finish up with is, if the court agrees that minimum contacts have been found, there are two additional parts to the analysis. The first is that these claims have to arise from those contacts. There doesn't appear to be any dispute on that, and additionally, as this court has noted multiple times, once minimum contacts are found, it's the rare case where exercise of jurisdiction would be unreasonable. So unless the court has questions, I'd be content to rest on our briefs at that point. Thank you, Counsel. You've saved some time. Mr. Singh? Thank you, Your Honor, Dijinder Singh for the appellees. I think we're on the same page that the way to do this is to look claim by claim and to see if there are substantial contacts with Texas and if the claims arise out of those contacts. I'd start with the contract claim. Now, Mr. Tisdall is characterizing this as if there is an umbrella contract that says any time Denzinger refers somebody to Morgan-Behrkamp, there's going to be a set fee arrangement. That's simply not true, and their complaint doesn't allege that. What their complaint alleges is that there were two other cases. In those two other cases, separate written fee agreements were struck with the clients which had a particular fee split. Was it a similar fee split? I'm sorry, Your Honor? Was it a similar fee split? It is similar to what they allege was struck in the oral contract in this case. Yes, that's correct. In fact, they're using that as the basis. But what I think that shows you at most is that Denzinger has a unilateral expectation of a continuing arrangement that will mimic past cases. That's not the same as a contract to split all the fees in future cases according to the same terms. And the reason you know that probably is that lawyers just can't do that. Lawyers have to come up with fee arrangements with their clients, and the clients have to approve those fee arrangements. Lawyers can't really agree in advance that this is how we're going to do it if the clients aren't going to come along. And so the way this works is there is no umbrella contract. There's certainly no allegation in the complaint of a written or oral agreement that says every time we do this, we're going to do it the same way. So Mr. Tisdall's characterization here is just not in sync with what they've alleged in the complaint. And I don't think it could be with any reasonable contract that lawyers and their clients come up with together. So then what that means, the reason that's important here, is that the contacts that relate to the other cases, the Gale Mines and Vanderslice cases, those aren't case-specific contacts. We'll agree that in some cases, Morgan Burkamp has purposely availed itself of Texas in connection with those cases. But those contacts do not give rise to the claim here. The claim here arises out of the alleged oral contract struck in May 2007. And according to the plaintiffs, and we'll just accept this as true for now, I think everyone understands it's disputed, they called us and said, let's split the fees the same way and we agreed. That's what they say. Assuming that to be true, it's still an example of them reaching out to us as opposed to us reaching into Texas to conduct business. If you think about purposeful availment, I direct the court's attention to both the Moncrieff Oil case and the Trois case. The Trois case is a really good example for us on the contract front. In that case, if you recall, the way it goes is there's an Ohio auction house and it wants a guy in Texas to send its goods to Ohio on consignment effectively so it can sell them. The auction house has its agent in Kentucky set up a conference call between the auction house owner and the guy in Texas. During that call, the man in Ohio makes misrepresentations about the auction house's ability to move the products in order to induce the business from Texas. And this court says when you make that kind of arrangement, the person in Ohio is really acting more as the initiator of the call as opposed to the sort of passive recipient of the communication from Texas, which is the opposite of this case. Here you have Don Zinker reaching out to us in Ohio to set up a business relationship. And then second, it says the purpose of the call is for the man in Ohio to push his business into Texas to get those products moving to him. And that's not really what's going on here at all. If you read the allegations of the complaint fairly read, and in fact the other side stresses this from time to time, they are pressing to get this case going together with my firm. They are reaching out of Texas to Ohio, to Dubai, to get this case off the ground. We are not reaching in. And so when you think about whether that's purposeful availment, I think the answer is a clear no. And in fact, there's on-point precedence that both sides have accepted that merely forming a contract is not enough to constitute purposeful availment, and that the predecessor conversations and negotiations are also not enough to constitute purposeful availment. So what we're left with then is their argument that they are doing meaningful, substantive work in Texas, that that's what the contract contemplates, this oral agreement that we struck. But that's not how they describe the oral agreement. The way they describe the oral agreement in the complaint is, we agreed, you'd give us a third of the fees for the referral. Now they could say, we did the referring work from Texas. All of the work we did to develop this client. We did that in Texas, and you're sort of backwardly compensating us for that. The problem with that argument is, I think, that that is a mere fortuity in the context of this court's precedence. The fact that this law firm happens to be in Texas, when it, through its website, finds a client in Dubai, does not mean that we've purposefully availed ourselves from Ohio of Texas by coming into this agreement, right? The fact that they've produced a product and then sold it to us, if they've produced a product in Texas and then sold it to us in Ohio, the fact that we pay for it, or agreed to pay for it, doesn't mean we've purposefully availed ourselves of Texas. And that's basically what they're alleging they've done. We built a thing over here in Texas, we've given it to you in Ohio, so now you've purposefully availed yourself of Texas. That's not how the law of purposeful availment works. I thought he was saying the allegation included not just we've referred it, but thereafter we worked together and you had multiple contacts with us to get us to help you convince EPP to file. Yeah, so let's talk through that piece of it. I think here's how the chronology for that works. In May 2007, the parties have this alleged oral agreement to split the fees. About a week later, a draft contract is circulated to EPP that has blanks for the fee split arrangements. There's no written agreement about that, but the conversation does continue until about January 2008 when EPP breaks off contact and no contract is consummated with EPP. It's not for two more years, more than two years actually, until EPP comes back to my clients only and my clients say, well, if you want to do something, we can loop in Danzinger if you want, otherwise we'll see that they're reasonably compensated after the fact for the work they did in 2007. So realistically, the amount of work that's actually being done after the supposed oral agreement is truly minimal. We're talking about a couple of emails. The amount of work that they say they agreed to do in that contract, they don't even say what they agreed to do in that contract. If you look at the paragraphs of the complaint where they describe this oral contract, it doesn't describe any work that they're supposed to do. And Judge Davis, to key in on a point you made earlier, if the question is, you know, from the past cases, what did they do? It shows two things. The past practice shows two things. For the cases that actually involved a substantial Texas element, that is the cases that were filed in Texas, Danzinger did do real work. It acted as local counsel. It didn't do the major substantive heavy lifting, that was all my clients, but it did some work. But there was one case prior that was also filed in the Eastern District of Pennsylvania, just like this one. Danzinger wasn't even listed on the papers, and they had to be told that there was a successful result. They didn't know on their own. So if you want to look at what the party's past practice was, it was when, as here, cases are filed in Pennsylvania, Danzinger played no role whatsoever, not even a non-substantive minor. You said that Epp came to your firm solely, but the reason he came to you is because he'd been referred by the defendant's firm. Did you have any contact with him before that? So, Your Honor, that's not in the record. I will say there has been jurisdictional discovery in this case. The other side sought it both in Pennsylvania and here, and they got it. And the answer that we gave them there was that there had been no contact with Epp prior to February 2010, between us and them. So they don't allege otherwise in the complaint. They don't provide any specific facts to the contrary. So I don't... No, but your only contact, your initial contact, and the only contact you had with Epp initially was for referral. That's true, Your Honor. Yes, that is correct. So would there be any other reason that he would have come to you? So, Your Honor, again, why he comes to us subsequently is not in the record. I can tell you about the timing, which has been disclosed in the discovery. But yeah, I think it's fair to say that Donziger's involvement was a but-for cause of us eventually being connected with the client. That's fine. But that doesn't mean we purposefully availed ourselves of Texas by contracting with a client in Dubai. From Ohio, we contract with Epp. And it's true. But for some things that happened in Texas, maybe that wouldn't have happened. I'll stipulate to that. But I don't think that that constitutes purposeful availment of Texas as a result. And here, I think it's important that we keep the merits and jurisdiction separate. If you think that they might be entitled to something because of the role they played in that chain of causation, maybe, maybe not. But the right place to figure that out is in court in Ohio, where they should have sued us in the first place, as opposed to trying in Pennsylvania and then trying again here. I do want to move on, though, to the tort claims as well. So this fraud claim is based on a communication that allegedly occurs in—well, that does occur in 2010. Don Zinger's partner, Dayano, sees a press release on the internet that is not about the Epp case and is not about our firm. He emails and says, hey, is this about Epp? And we say, no, because that's true, and it's conceded that's true. And they say that's a fraud. Now, okay, maybe. But even if it is, you know, as you look at the line of cases that this court has decided about when an affirmative misrepresentation can be sufficient to be purposeful availment, I think those cases—so first of all, they have to involve like a clear lie, which this one doesn't. So then the other side talks about how, well, actually, this is about nondisclosure. You should have told us something. There is an essential predicate to nondisclosure, and this is a good time to talk about the Wiener case, which was mentioned during Mr. Tisdall's presentation as well. In the Wiener case, there's a lawyer in Germany who has a client in Texas, and he says, I'm going to help you consummate this transaction that's going to happen abroad. You're going to buy another airline company. And he keeps on lying about the transaction. He says, oh, yes, we're going to close this month. They don't close. We're going to close in a week. They're not going to close. Ultimately, he takes like $5 million of the client's money that gets misappropriated. He induces them to pay him another million dollars through these lies. And this court says, look, in this context where you have this pattern of communications back and forth about this, and you keep lying, and you keep omitting the truth, there is personal jurisdiction. There's purposeful availment of your client in Texas. No shock, really. I mean, he's taking millions of their dollars of a Texas company as their lawyer who has a fiduciary responsibility to them. All of the facts here are different. There is no predicate fiduciary duty that gives rise to a duty to disclose this information, which is important, because you would think this is one of those strange areas where the merits and jurisdiction intersect a little bit, because obviously this is also a merits question of was there a duty to disclose. But it relates to jurisdiction, because in order to establish that not talking to someone in Texas is purposeful availment of Texas, something special has to be going on. You do not generally purposefully avail yourself of a state by neglecting that state. And so if they want to win, that this unusual upside-down rule applies, I think they have to at least allege a confidential relationship or a fiduciary relationship. And I'll say, the first time they say that there is a confidential relationship requiring disclosure is in their reply brief in this court. It's not in the complaint. It's not in the opening brief. They don't even make the conclusory allegation that there is a confidential relationship giving rise to a duty to disclose. And realistically, that's because they can't. And so in the absence of that, and in the absence of those repeated communications about the EPP matter specifically, I don't think Wiener provides them with very good authority at all. I think the far better way to think about this case is that when you're talking about the communications that didn't happen, which are just talking about it, but were about different cases, what you're talking about is contacts that are not suit-related. Is the Streber case as thorough and repetitive as Wiener? I'm sorry? Streber is the pronunciation? Yeah, yeah. That didn't have the same extent that existed in Wiener. No, I think that is correct. And so, too, in Trois, right? In Trois, this court finds on the basis of a couple of conference calls, that's enough for purposeful availment when you have a specific lot, right? But I think when you're talking about omissions, you need to have that predicate of a duty to disclose, which only comes from either a fiduciary relationship or a confidential relationship. In the absence of that, I don't think you can call failure to disclose information purposeful availment that gives rise to the claim. Today, in argument, he was stressing more the tortious interference. Yeah, I'd love to talk about that claim, too. So the way the tortious interference claim works is that my client sends an email to Epp abroad. So email goes from Ohio to abroad. And the email says, if you want us to involve Rod Dayano, let us know, otherwise we'll see that he's compensated. And that's the conduct that gives rise to the tortious interference claim. Now, accepting that that could have interfered with the ability, with Epp's inclination to contract separately with Donziger, which, of course, is a proposition we'll test on the facts in the appropriate forum. But accepting that for the moment, I think it is on all fours with the Sangha case that you mentioned, Judge Higginson. So in the Sangha case, there is a mooring master on a boat. And he's terminated by his former employer because he bumps into another boat. And then he starts working for a different employer. And there's going to be a situation where their boats are near each other again, and the former employer reaches out and says, we don't want him involved in those maneuvers because there's still an impending insurance matter, we have concerns. And the new employer responds by firing the guy. And the man says, okay, look, you sent this email communications to my employer, who was in Alabama, but this work was about work to be done in Texas. And I felt the injury where I was in the Port of Houston, where I was terminated. And this court specifically says, and I'm paraphrasing as closely as I can, I don't have the case right in front of me. It says, communications about work to be done in Texas, about a contract for work to be done in Texas, which caused injury in Texas, foreseeably, are not enough, are legally insufficient, is the phrase in this court's opinion. Those things are legally insufficient to establish purposeful availment. And I think it's quite similar here. You know, here we didn't even say anything mean about them to the client. We just said we can involve them if you want, or otherwise we won't. So it's even a less extreme case, a less compelling case for purposeful availment than you would have seen in that case. But in that case, you know, the communication just says, here, we don't want this guy involved. The employer reacts by terminating, not enough for personal jurisdiction in Texas, because the communication was directed to the employer in Alabama. And it was, the fact that it was about things that would happen in Texas just isn't enough. And so, too, here, at most, that communication with Epp was about a contract he might choose to strike or not with somebody in Texas. It wasn't directed to Texas, didn't involve anyone going to Texas, nobody in Texas received it or wrote it. It's very hard for me to see how that could possibly constitute purposeful availment for purposes of the tortious interference claim.  A third party outside the state, nevertheless, do interfere a lot with business arrangements in the state. They cited a couple examples. Their Central Freight Lines case, for example, was about a contract between two entities in Texas that a third party interfered with. But that's different from the circumstances of this case, because Epp is not also in Texas. You know, when you have two entities in Texas, it's very reasonable to say that tortiously interfering with their contract, even from outside, is going to interfere with business in Texas, with economic activity in Texas. And Texas has an interest in vindicating that. Not so here. I think here, the question is really about, you know, we're communicating with somebody abroad about our intentions and his potential intentions and what he wants to do next. And he's making decisions. The fact that the Texas entity, the law firm is a Texas entity, is, again, as I say, fortuitous. The same communication would have been sent, would have had the exact same effect if Donziger were an Arizona law firm or anything else. It has nothing to do with Texas. It only has to do with Donziger. The same is also, of course, true of their unjust enrichment claim. The gist of the unjust enrichment claim is, we got all the money and we kept all the money instead of giving it to them. Assuming that's true, we did it in Ohio. We got all the money in Ohio. We kept all the money in Ohio. We did not, you know, take money out of Texas or do anything else in Texas. It's only Donziger, the plaintiff specifically, and not Texas, the forum state, that's affected. And I think Walden stands very clearly for the proposition that when the plaintiff is the only nexus between the defendants and the forum, the only case-relevant nexus between the defendants and the forum, there's really just nothing to say there that's not purposeful availment. It's not minimum contacts in an intentional tort type of case. So there was a case that I mentioned just at the start of the argument that I just want to loop back in before I sit down, and that's the Moncrief oil case. So this is another, I think, very helpful case for our side. In this case, there's an oil company in Texas that wants to collaborate with foreign entities about the development of an oil and gas field in Russia. And the contract goes sideways, and they try to sue the Russian entities here. And the most relevant part of the opinion for present purposes, there's stuff that I've already said, like negotiations leading to a contract or even contracting aren't enough. But there's a specific line in the case that you would probably want to cite in this case that says, the mere fact that everybody knew that Moncrief was going to perform a significant part of its obligations in Texas under the contract was also insufficient to give rise to purposeful availment for purposes of either contract or tort claims. And the same is true here. At most, they've alleged that we knew they were going to perform here. That's not enough. Thank you. Thank you, counsel. Mr. Tisdall? Thank you, Your Honor. I'm going to take these in reverse order, starting with the unjust enrichment claim. I believe counsel said that the gist of that claim is that Morten Bergkamp was enriched in Ohio. I think the gist of an unjust enrichment claim is the unjust conduct. That's what gives rise to the cause of action, and that turns on whether the fraud provides jurisdiction or not. So I would submit at least that the court's decision on fraud and on unjust enrichment could be the same and should be the same, because the underlying conduct, the contacts are the same for both. Turning to the tortious interference case, I don't disagree that foreseeability alone is insufficient to provide jurisdiction, but that's different than what happened here, because the tortious interference was directed at Danziger. Now, the email was directed to Mr. F., I agree, but the conduct, the purpose was to cut out one specific entity that there had already been a relation with to ensure that Texas entity wouldn't form a contract. So I think that is an additional connection. And just like the quick copy case, when you are deliberately trying to harm a Texas entity and to prevent economic activity to occur, that's different than merely knowing that would occur. And I think that's what makes that 2010 communication specifically directed at Danziger's engagement in the lawsuit provide a basis for jurisdiction. Now, on the fraud case, I do think it is a merits question of whether there's a duty to disclose. That was certainly how it was briefed to the district court as a 12B6 challenge. And I think there are allegations, at least two, of a confidential relationship. One is the fact that over the course of these years, Danziger had grown comfortable enough that it was introducing clients to Morgan Berkamp and working to get their case on file before it had any agreement with Morgan Berkamp of how it was going to be compensated for doing that. I think that shows a high degree of trust. And then once you have an oral agreement, once you form this partnership to work on Mr. Epps' case, you then need to say something if something occurs with him in the case. You have a duty to tell your business partner, hey, we're going to go file a case on his behalf. And so I think certainly at this stage, the court doesn't need to get into the merits of whether there is a duty to disclose or not because there are sufficient allegations that this court needs to accept that provide that. The other issue that counsel brought up was the pattern of communication of the body. We know that a single act can serve as the basis. And I agree, this case is, as I think counsel put it, upside down because we're talking about non-disclosure. But the non-disclosure occurred at a minimum every time the parties talked about some other case over the four years since they got back in touch with Mr. Epps and never said anything. So I think each one of those instances was an opportunity to say, hey, by the way, we've engaged with Mr. Epps. And each time they chose not to do that, based on their relationship, they were causing a harm in Texas. And I think each of the cases that we've cited in our brief, certainly Winer, involve not just affirmative misstatements, but also where the party didn't say something. I don't think it has to be a lawyer-client relationship, and this isn't a legal malpractice case. So if we assume there's a duty to disclose, then I think that's sufficient. Lastly on the contract case, excuse me, on the breach of contract claim, it was more than a relationship that was set up. It was a relationship that was then agreed to and that work was performed on that. And I think that affirmative step, when Mr. Delano called up and said, hey, what do you guys think about working together on this case, when they say yes, they have now purposely availed because they're taking advantage of that. And I don't think the products liability or product case is the right lens to look through this because these are service entities. They're creating intangible products, talking about a lawsuit that could be filed anywhere in the country. So it's not as if Danziger was writing a brief and shipping it to Morgan Burkhamp in Ohio. Each of them was working together jointly on this group project, and Morgan Burkhamp wanted Danziger to do that from Texas. It asked for Danziger to do that from Texas, and it would have continued to ask for Danziger to do that because that was the purpose of splitting up that remaining third of the fees. Finally, the amount of work that Danziger did, whether minimal or not, was certainly some, and it certainly would have anticipated that Danziger would have done something, and that shows that the parties contemplated that there'd be future consequences in Texas, and Morgan Burkhamp, if it breached that agreement, should have to answer to those in Texas. Thank you. Thank you, counsel. Case is submitted. We'll hear the final case for our sitting.